## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

VIRTUAL GAMING TECHNOLOGIES, LLC,

     *Plaintiff,*

     **v.**

ELECTRONIC ARTS, INC.,

     *Defendant.*

Civil Action No._____

**JURY TRIAL DEMANDED**

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Virtual Gaming Technologies, LLC ("Virtual Gaming" or "Plaintiff"), by and through its attorneys, brings this action and makes the following allegations of patent infringement relating to U.S. Patent Nos. 5,860,862 ("the '862 patent") and 6,193,610 ("the '610 patent"). Defendant Electronic Arts, Inc. ("EA" or "Defendant") infringes Virtual Gaming's '862 and '610 patent in violation of the patent laws of the United States of America, 35 U.S.C. § 1 *et seq.*

## INTRODUCTION

1.     In a relentless effort to expand its market share and profit from the use of infringing computer-based interactive gaming systems, EA has undertaken to copy the technologies and inventions of William W. Junkin, the inventor of the '862 and '610 patents.

2.     Mr. Junkin is a prolific inventor of computer-based interactive gaming systems that enable the provision of an interactive game where participants compete in real time.

3.     Mr. Junkin is a named inventor of at least 18 issued United States Patents and pending United States Patent Applications. Patents referencing Mr. Junkin's '862 and '610 patents have been purchased by or assigned to several large companies, including: CBS Interactive, Inc., Disney Enterprises, Sony Corporation, The Walt Disney Company, and Verizon Services Corporation.

## JUNKIN'S DEVELOPMENT OF INTERACTIVE GAMING SYSTEMS

4.      Mr. Junkin is a pioneer in the interactive computer gaming industry and used his insights to create the interactive gaming technologies that are used today by EA and many of the world's largest gaming companies without attribution or compensation.

5.      In 1992, Mr. Junkin founded FantaSports, one of the pioneers in the development of interactive fantasy sports games.  As CEO of FantaSports, Mr. Junkin created, developed and marketed some of the largest fantasy sports games ever conducted in the United States.

6.      In addition, Mr. Junkin was responsible for the creation of the first multi-player fantasy game that provided for an unlimited number of participants.

7.      Due in large part to his efforts, FantaSports was incredibly successful – generating millions of dollars in gross revenues – and extremely innovative.  For example, FantaSports was the first company to use interactive fantasy sports games as sponsorship tools to drive retail store visits and sales – a tactic that is used by every fantasy sports website today.

8.      The patents-in-suit - the '862 and '610 patents - are pioneering patents in the field of real-time, interactive gaming systems.

9.      The '862 patent has been cited by over 222 United States patents as prior art before the United States Patent and Trademark Office. Companies whose patents cite the '862 patent include:

- Bally Gaming, Inc.;
- CBS Interactive, Inc.;
- Disney Enterprises, Inc.;
- Fantasy Sports, Inc.;
- Konami Digital Entertainment, Inc.;
- Rovi Corporation;
- Sony Corporation / Sony Electronics, Inc.;
- The Walt Disney Company;
- Verizon Services Corporation; and
- Zynga, Inc.

10.     The '610 patent has been cited by over 272 United States patents as prior art before the United States Patent and Trademark Office. Companies whose patents cite the '610 patent include:

- ACTV, Inc.;
- CBS Interactive, Inc.;
- Disney Enterprises, Inc.;
- Electronic Arts, Inc.;
- Fox Interactive Media, Inc.;
- International Game Technology PLC;
- Intel Corporation;
- Konami Corporation;
- Microsoft Corporation;
- Open TV, Inc.;
- Rovi Corporation;
- Sony Corporation / Sony Electronics, Inc.;
- The DIRECTV Group, Inc.;
- The Walt Disney Company;
- Verizon Services Corporation;
- Yahoo, Inc.; and
- Zynga, Inc.

11.     Highlighting their value, leading technology company, Rovi Technologies, purchased the '862 and '610 patents in 2009.

12.     The claims in the patents-in-suit are directed at systems and methods that enable participants in a contest system to interact with the contest system on a real-time basis.  This represented a substantial improvement over prior art systems, which were limited in utility because they failed to allow for any real-time access to player databases or real-time access to information relating to the performance of participants' teams.

## THE PARTIES

13.     McKinney, Texas based Virtual Gaming is committed to advancing the current state of technology in the field of interactive gaming systems. Virtual Gaming is a Texas limited liability company with its principal place of business at 321 North Central Expressway, Suite 307, McKinney, Texas 75070.



14.     Virtual Gaming is a small, Texas-based company.  Virtual Gaming depends on patent protection to effectively license its innovative technologies and build its business.

15.     On information and belief, EA is a Delaware corporation with its principal office at 209 Redwood Shores Parkway, Redwood City, CA 94065.  EA may be served with process at this address and/or by the service of this Complaint on its registered agent, The National Corporate Research, Ltd., 206 E. 9th Street, Suite 1300, Austin, TX 78701.

16.     According to EA's website, EA offers infringing products for sale throughout the United States, including in the Eastern District of Texas.  Further, EA advertises its infringing products throughout the Eastern District of Texas and claims financial benefits through its conducting of business in Texas.

17.     In addition, on information and belief, EA maintains an office in Austin, Texas and employs and recruits Texas residents to create infringing products and/or services.

18.     Moreover, on information and belief, EA has registered with the Texas Secretary of State to do business in Texas.

## JURISDICTION AND VENUE

19.     This action arises under the patent laws of the United States, Title 35 of the United States Code.  Accordingly, this Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

20.     Upon information and belief, this Court has personal jurisdiction over EA in this action because EA has committed acts within the Eastern District of Texas giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over EA would not offend traditional notions of fair play and substantial justice.  Defendant EA, directly and through subsidiaries or intermediaries (including distributors, retailers, and others), has committed and continues to commit acts of infringement in this District by, among other things, offering to sell and selling products and/or services that infringe the '862 and '610 patents.

21.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(d) and 1400(b).  Upon information and belief, Defendant EA has transacted business in the Eastern District of Texas and has committed acts of direct and indirect infringement in the Eastern District of Texas.

## THE VALUE OF MR. JUNKIN'S INVENTIONS

22.     Mr. Junkin is a successful and highly-respected executive in the fields of fantasy sports and digital, interactive gaming.  Mr. Junkin is currently the President of FantasySports.com, Director at Sports Eye Site, Chairman of iTV Entertainment, LLC, and a Board Member of several innovative private companies, including Advertiles, TodoCast, and Incubate.

23.     Executives at leading fantasy sports companies have emphasized the paramount importance of the interactive nature of Mr. Junkin's inventions.  Mark Nerenberg, Chief Product Office at DraftStreet.com, stated that:

> "It's not something we are willing to bend on at all. A large percentage of our users, when they play, are watching their team and their opponents team, and it gets very exciting with everything updating live and as fast as possible."
>
> "It's been a work in progress in the past, and has been a struggle to pull in the information and have it update as quickly as possible. There can be bottlenecks in the code and we have worked to create optimization in the code. So we have spent a lot of time using different caching methods to really optimize that so it is a seamless process and users can see all their opponents and all the players and all the stats updating in real time."

Joshua Meredith, *Fantasy Sports:  Where Technology Meet Entrepreneurs, Wall Street Analytics, Gambling, and Internet Poker*, SPORTSTECHIE SPORTS AND TECHNOLOGY WEBSITE, July 29, 2013, http://www.sporttechie.com/2013/07/29/fantasy-sports-where-technology-met-entrepreneurs-wall-street-analytics-gambling-and-internet-poker/ (highlighting added).

24.     Not long after the creation of FantaSports, a number of other companies began offering online, interactive fantasy sports competitions, including Commissioner.com (launched in January of 1997)[1], Rotonews.com (launched in January of 1997), and Yahoo (launched in 1999).

25.     However, according to Jeff Thomas, CEO of World Fantasy Games, even "[a]s of 1999, fantasy gaming was still heavily offline…. It wasn't until 2000 or 2001 that you had more players online than offline. It was a much different world at that time."[2]

26.     Numerous studies and articles have confirmed the value of Mr. Junkin's inventions, which are drivers of the increased popularity of fantasy sports today.  For example, at the time that Mr. Junkin conceived of the inventions disclosed by the patents-in-suit, the playing of fantasy sports games was a fringe activity enjoyed by few.  However, due to Mr. Junkin's inventions, "as of August, 56.8 million people in the United States and Canada [have] played fantasy sports in

---

[1] Commissioner.com was sold to SportsLine in 1999 which was itself sold to CBS in 2004.  The Commissioner.com technology is now the fantasy sports engine behind CBSSports.com.
[2] Jason Ankeny, *The Reality of Fantasy Sports*, ENTREPRENEUR.COM, August 19, 2009, http://www.entrepreneur.com/article/203140.

6

2015."[3]  What's more, fantasy sports has become a $27 billion business[4] due to the excitement provided by advanced interactive gaming systems such those invented by Mr. Junkin.

## U.S. PATENT NO. 5,860,862

27.     Virtual Gaming is the owner by assignment of the '862 patent.  The'862 patent is entitled "Interactive system allowing real time participation."  The '862 patent issued on January 19, 1999, based on a patent application filed on January 5, 1996.  A true and correct copy of the '862 patent is attached hereto as Exhibit A.

28.     The claims in the '862 patent are directed at a unique computing solution that addresses a problem particular to computer networks – enabling real time interaction with contest systems over the Internet.

29.     Enabling real time interaction with contest systems over a computer network presented new and extraordinary issues over the techniques and systems known in the art at the time.  Prior art contest systems had a number of drawbacks.  Such systems "enable fantasy owners to optimize scores obtained by a team through team member trades," but are "not interactive on a real time basis."  '862 patent, 1:37-40.  Such systems "prevent[] optimization of team roster performance and enjoyment of the interactive system."  '862 patent, 1:46-47.

30.     The technologies claimed in the '862 patent were aimed at solving problems specific to the internet.  For example, the identified best mode of the '862 patent contemplates a system where:

> The central controller 2 includes a central computer 20 coupled to a contest roster and team roster databases 22 and 26, a storage device 28 and a communication network 246. The interactive apparatus 4 includes an interactive device(s) coupled to the communication network 246. The statistical controller 6 comprises a statistical computer 60 coupled to a storage device 62 and the communication network 246, and receiving statistical input data. In the embodiment of FIGS. 2(A-B), the central computer 20 directly receives the statistical input.

'862 patent, 3:34-43.

---

[3] John Affleck, *What's Behind Fantasy Football's Surprising Popularity*, FORTUNE MAGAZINE ONLINE, September 12, 2015, http://fortune.com/2015/09/12/fantasy-football-growth/.
[4] *Id.*

31.     The technology of enabling real time interaction and optimization of a fantasy sports team was not a conventional business practice.

32.     The '862 patent does not preempt every way of enabling "participants to compete in an interactive game based on an event which is occurring in real time," ('862 patent, Abstract), as systems for doing so existed before this invention, and systems exist now that allow the provision of fantasy gaming systems without infringing the claims of the '862 patent.

33.     The '862 patent claims do not preempt the field or preclude the use of other effective and enjoyable interactive gaming systems.  The '862 patent claims include inventive elements that greatly limit the breadth of the claims.  These limitations are not necessary or obvious tools for achieving a real time, interactive contest system, and they ensure that the claims do not preempt the field of interactive contest systems.

34.     Other techniques for interactive contest systems that are not included within the scope of the '862 patent's claims include, but are not limited to, the prior art discussed in the '862 patent.[5]  For example, the interactive gaming system claimed by claim 17 of the '862 patent does not preclude an interactive gaming system operated using a centralized server.

35.     The '862 patent claims do not preempt the field of interactive contest systems. Technologies falling outside the scope of the '862 patent may include, but are not limited to, the following: (1) contest systems that are not interactive or provide limited interactivity, (2) contest systems that don't generate real time score values, and (3) contest systems that don't provide real time score values to the participants.

36.     The '862 claims are not directed to any "method of organizing human activity," "fundamental economic practice long prevalent in our system of commerce," nor are any of the claims "a building block of the modern economy."

37.     The inventive concept in the '862 claims is a technological one rather than an entrepreneurial one.

---

[5] *See, e.g.*, U.S. Patent No. 5,013,038 to Luxenberg, U.S. Patent No. 5,114,155 to Tillery, U.S. Patent No. 5,018,736 to Pearson, and U.S. Patent No. 5,263,723 to Pearson.

38.     The '862 patent does not take a well-known or established business method or process and "apply it to a general purpose computer."  Instead, the specific system and processes described in the '862 patent have no direct corollary to a business process that predates the advent of the internet.

39.     The '862 patent's claims are directed toward a solution rooted in computer technology and uses technology unique to computers and networks to overcome a problem specifically arising in the realm of providing interactive contest systems over a computer network.

40.     The '862 patent's claims are not directed at a mere mathematical relationship or formula.

41.     The '862 patent's claims cannot be performed by a human, in the human mind, or by pen and paper.  These limitations establish that the '862 patent's claims are not an abstract idea, because they cannot be performed by a human, in the human mind, or by pen and paper.

42.     Further, the '862 patent disclosure requires a computer to enable interactive contest systems.  For example, in Fig. 1B, the systems and methods disclosed in the '862 patent connect at least one interactive device with a central computer and a statistical computer through a communication network.



'862 patent, Fig. 1B (showing the implementation of the '862 patent system arose from receiving user data over a communications network, such as the internet, including through a website).

43.     The prior art cited on the face of the '862 patent further shows the invention claimed in the '862 patent is not a patent ineligible abstract idea.  The invention described in the '862 patent's claims is narrower than much of the cited prior art, and therefore, is not an abstract idea.

44.     The claimed invention in the '862 patent's claims is rooted in computer technology and overcame a problem specifically arising in the realm of computer networks.  The '862 patent's claims require the use of a computer system.

45.     The use of a computer system plays a significant part in performing the claims of the '862 patent.  For example, the use of a controller to generate real time score values indicative of player performance and statistical controller to receive statistical input data through a

communication network are integral to the success of the system, and can only be performed using a computer system.  The use of a computer system to generate and transmit real time score values and to receive statistical input data through a communication network do far more than improve the efficiency of the process; the computer system is integral to accomplishing the effective functioning of the claimed systems and methods.

46.     One or more of the claims of the '862 patent recite a means or step for performing a specified function.

47.     One or more of the claims in the '862 patent recite means-plus-function claim limitations governed by 35 U.S.C. § 112, ¶ 6.

48.     Means-plus-function claims such as those included in the '862 patent are inherently not abstract ideas.  Stanford Law Professor Mark Lemley described his analysis:

> If the patent is interpreted as a means-plus-function claim, it will be limited to the particular software implementation the patentee actually built or described.  Such a narrow, specific claim should not be an unpatentable "abstract idea."[6]

> But if you wrote it [an algorithm] and you included it in the step I think you could survive the *Aristocrat* line of cases and then the question will become well what does equivalent thereof mean?  Can I show you my algorithm and say, yeah, this is the approach I took but these other four approaches are equivalent and a computer programmer would look at those and say I don't care which one of those you use.  ***And if you can do that then you might end up with a claim that's still pretty broad even though it's in means plus function format***.[7]

### U.S. PATENT NO. 6,193,610

49.     Virtual Gaming is the owner by assignment of the '610 patent.  The '610 patent is entitled "Interactive television system and methodology."  The '610 patent issued on February 27, 2001, based on a patent application filed on September 29, 1997, and claims priority to a

---

[6] Mark A. Lemley, *Software Patents and the Return of Functional Claiming*, 2013 WISC. L. REV. 905 (2013).

[7] Eugene Quinn, *The Ramifications of Alice: A Conversation with Mark Lemley*, IPWATCHDOG BLOG, September 4, 2014, http://www.ipwatchdog.com/2014/09/04/the-ramifications-of-alice-a-conversation-with-mark-lemley/id=51023/ (emphasis added).

provisional application filed on January 5, 1996.  A true and correct copy of the '610 patent is attached hereto as Exhibit B.

50.     The claims in the '610 patent are directed at a unique computing solution that addresses a problem particular to computer networks – enabling participants to compete "in a contest or game created around an individual event or series of events while it is aired on television." '610 patent, 1:49-51.

51.     The technologies claimed in the '610 patent were aimed at solving problems specific to the internet.  For example, the identified best mode of the '610 patent contemplates a system where:

> The communication network 246 couples the interactive device 40, the central computer 20 and/or the statistical computer 60. The dotted lines indicate that each of the central controller 2, interactive apparatus 4 and the statistical controller 6 include appropriate devices for communication. For example, the apparatus 4 and controllers 2 and 6 may include modems for telephone line communication and transmitters and/or receivers for optical, cable, microwave or satellite communication to allow the participants to interact in the game in real time while watching a display device of the interactive device showing the event or a video program. Alternatively, communication between the participant and central controller can be audio text delivery in response to touch tone telephone input.

'610 patent, 3:54-67.

52.     The technology of enabling participation in an interactive game occurring in real time with an actual event was not a conventional business practice.

53.     The '610 patent does not preempt every way of "allow[ing] participants to compete in an interactive game, such as a contest or sporting event, occurring in real time…" ('610 patent, Abstract), as systems for doing so existed before this invention, and systems exist now that allow the provision of fantasy gaming systems without infringing the claims of the '610 patent.

54.     The '610 patent claims do not preempt the field or preclude the use of other effective and enjoyable interactive gaming systems.  The '610 patent claims include inventive elements that greatly limit the breadth of the claims.  These limitations are not necessary or

obvious tools for achieving a real time, interactive contest system, and they ensure that the claims do not preempt the field of interactive contest systems.

55.     Other techniques for interactive contest systems that are not included within the scope of the '610 patent's claims include, but are not limited to, the prior art discussed in the '610 patent.[8]

56.     The '610 patent claims do not preempt the field of interactive contest systems. Technologies falling outside the scope of the '610 patent may include, but are not limited to, the following: (1) contest systems that are not interactive or provide limited interactivity, (2) contest systems that don't generate real time score values, and (3) content systems that don't provide real time score values to the participants.

57.     The '610 claims are not directed to any "method of organizing human activity," "fundamental economic practice long prevalent in our system of commerce," nor are any of the claims "a building block of the modern economy."

58.     The '610 patent's claims are not directed at the broad concept or idea of "interactive games." '610 patent, Abstract.  Instead, the claims are directed to particular, narrow systems that "allow[] participants to compete in an interactive game, such as a contest or sporting event" using technologies unique to the internet age.  The inventive concept in the '610 claims is a technological one rather than an entrepreneurial one.

59.     The '610 patent does not take a well-known or established business method or process and "apply it to a general purpose computer."  Instead, the specific system and processes described in the '610 patent have no direct corollary to a business process that predates the advent of the internet.

60.     The '610 patent's claims are directed toward a solution rooted in computer technology and uses technology unique to computers and networks to overcome a problem

---

[8] *See, e.g.*, U.S. Patent No. 4,592,546 to Fascenda, U.S. Patent No. 4,722,526 to Tovar, U.S. Patent No. 5,013,038 to Luxenberg, U.S. Patent No. 5,114,155 to Tillery, U.S. Patent No. 5,018,736 to Pearson, and U.S. Patent No. 5,263,723 to Pearson.

specifically arising in the realm of providing interactive contest systems based upon real time events over a computer network.

61.     The '610 patent's claims are not directed at a mere mathematical relationship or formula.

62.     The '610 patent's claims cannot be performed by a human, in the human mind, or by pen and paper.  These limitations establish that the '610 patent's claims are not an abstract idea, because they cannot be performed by a human, in the human mind, or by pen and paper.

63.     Further, the '610 patent disclosure requires a computer to enable interactive fantasy sports systems.  For example, in Fig. 1B, the systems and methods disclosed in the '610 patent connect at least one interactive device with a central computer and a statistical computer through a communication network.



'610 patent, Fig. 1B (showing the implementation of the '610 patent system arose from receiving user data over a communications network, such as the internet, including through a website).

64.     The prior art cited on the face of the '610 patent further shows the invention claimed in the '610 patent is not a patent ineligible abstract idea. The invention described in the '610 patent's claims is narrower than much of the cited prior art, and therefore, is not an abstract idea.

65.     The claimed invention in the '610 patent's claims is rooted in computer technology and overcame a problem specifically arising in the realm of computer networks. The '610 patent's claims require the use of a computer system.

66.     The use of a computer system plays a significant part in performing the claims of the '610 patent. For example, the use of a controller to generate real time score values indicative of player performance and an interactive device to display video information to the participants are integral to the success of the system, and can only be performed using a computer system. The use of a computer system to generate and transmit real time score values and to display video information do far more than improve the efficiency of the process; the computer system is integral to accomplishing the effective functioning of the claimed systems and methods.

67.     One or more of the claims of the '610 patent recite a means or step for performing a specified function.

68.     One or more of the claims in the '610 patent recite means-plus-function claim limitations governed by 35 U.S.C. § 112, ¶ 6.

69.     Means-plus-function claims such as those included in the '610 patent are inherently not abstract ideas. Stanford Law Professor Mark Lemley described his analysis:

> If the patent is interpreted as a means-plus-function claim, it will be limited to the particular software implementation the patentee actually built or described. Such a narrow, specific claim should not be an unpatentable "abstract idea."[9]

> But if you wrote it [an algorithm] and you included it in the step I think you could survive the *Aristocrat* line of cases and then the question will become well what does equivalent thereof mean? Can I show you my algorithm and say, yeah, this

---

[9] Mark A. Lemley, *Software Patents and the Return of Functional Claiming*, 2013 WISC. L. REV. 905 (2013).

is the approach I took but these other four approaches are equivalent and a computer programmer would look at those and say I don't care which one of those you use.  ***And if you can do that then you might end up with a claim that's still pretty broad even though it's in means plus function format***.[10]

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 5,860,862

70.     Virtual Gaming references and incorporates by reference the preceding paragraphs of this Complaint.

71.     EA makes, uses, sells, and/or offers for sale in the United States products and/or services for enabling interactive participation in contest game systems, including but not limited to the EA Interactive Gaming Platform ("the EA Platform").  The EA Platform operates in conjunction with many of EA's games, including but not limited to its Madden, FIFA, NBA Jam, and NHL games.

72.     On information and belief, EA makes, uses, sells, and/or offers for sale to customers interactive gaming products and services, such as the EA Platform and all versions and variations thereof since the issuance of the '862 patent ("EA Products").

73.     On information and belief, the EA Products comprise interactive gaming systems.

74.     On information and belief, the EA Products are available to businesses and individuals throughout the United States.

75.     On information and belief, the EA Products are provided to businesses and individuals located in the Eastern District of Texas.

76.     On information and belief, the EA Products enable generating real time score values indicative of performances of players involved in an event.

77.     On information and belief, the EA Products enable displaying video information to each participant of an interactive game based on the event.

---

[10] Eugene Quinn, *The Ramifications of Alice: A Conversation with Mark Lemley*, IPWATCHDOG BLOG, September 4, 2014, http://www.ipwatchdog.com/2014/09/04/the-ramifications-of-alice-a-conversation-with-mark-lemley/id=51023/ (emphasis added).

78.     On information and belief, the EA Products enable conveying the real time score values to each participant.

79.     On information and belief, the EA Products enable selecting at least one player to comprise a team for each participant of the interactive system.

80.     On information and belief, EA has directly infringed and continues to directly infringe the '862 patent by, among other things, making, using, offering for sale, and/or selling interactive gaming products and services, including but not limited to, the EA Products, which include infringing interactive gaming technologies.  Such products and/or services include, by way of example and without limitation the EA Platform, which is covered by one or more claims of the '862 patent, including but not limited to claims 1 and 24.

81.     By making, using, testing, offering for sale, and/or selling interactive gaming products and services, including but not limited to the EA Products, EA has injured Virtual Gaming and is liable to Virtual Gaming for directly infringing one or more claims of the '862 patent, including at least claims 1 and 24, pursuant to 35 U.S.C. § 271(a).

82.     On information and belief, EA also indirectly infringes the '862 patent by actively inducing infringement under 35 U.S.C. § 271(b).

83.     EA has had knowledge of the '862 patent since at least service of this Complaint or shortly thereafter, and on information and belief, EA knew of the '862 patent and knew of its infringement, including by way of this lawsuit.

84.     On information and belief, EA intended to induce patent infringement by third-party customers and users of the EA Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  EA specifically intended and was aware that the normal and customary use of the accused products would infringe the '862 patent.  EA performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '862 patent and with the knowledge, or willful blindness to the probability, that the induced acts would constitute infringement.  For example, EA provides the EA Products that have the capability of operating in a

17

manner that infringe one or more of the claims of the '862 patent, including at least claims 1 and 24, and EA further provides documentation and training materials that cause customers and end users of the EA Products to utilize the products in a manner that directly infringe one or more claims of the '862 patent.  By providing instruction and training to customers and end-users on how to use the EA Products in a manner that directly infringes one or more claims of the '862 patent, including at least claims 1 and 24, EA specifically intended to induce infringement of the '862 patent.  On information and belief, EA engaged in such inducement to promote the sales of the EA Products, *e.g.,* through EA's user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '862 patent. Accordingly, EA has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '862 patent, knowing that such use constitutes infringement of the '862 patent.

85.     To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '862 patent.

86.     As a result of EA's infringement of the '862 patent, Virtual Gaming has suffered monetary damages, and seeks recovery in an amount adequate to compensate for EA's infringement, but in no event less than a reasonable royalty for the use made of the invention by EA together with interest and costs as fixed by the Court.

## COUNT II
## INFRINGEMENT OF U.S. PATENT NO. 6,193,610

87.     Virtual Gaming references and incorporates by reference the preceding paragraphs of this Complaint.

88.     EA makes, uses, sells, and/or offers for sale in the United States products and/or services for enabling interactive participation in contest game systems, including but not limited to the EA Interactive Gaming Platform ("the EA Platform").  The EA Platform operates in

conjunction with many of EA's games, including but not limited to its Madden, FIFA, NBA Jam, and NHL games.

89.     On information and belief, EA makes, uses, sells, and/or offers for sale to customers interactive gaming products and services, such as the EA Platform and all versions and variations thereof since the issuance of the '610 patent ("EA Products").

90.     On information and belief, the EA Products comprise interactive gaming systems.

91.     On information and belief, the EA Products are available to businesses and individuals throughout the United States.

92.     On information and belief, the EA Products are provided to businesses and individuals located in the Eastern District of Texas.

93.     On information and belief, the EA Products enable generating real time score values indicative of performances of players involved in an event.

94.     On information and belief, the EA Products enable displaying video information to each participant of an interactive game based on the event.

95.     On information and belief, the EA Products enable conveying the real time score values to each participant.

96.     On information and belief, the EA Products enable accessing a first roster database containing real time score values of players in the event.

97.     On information and belief, the EA Products enable selecting at least one player to comprise a team for each participant of the interactive system.

98.     On information and belief, the EA Products enable accessing a second roster database containing real time score values of players on a specific team.

99.     On information and belief, EA has directly infringed and continues to directly infringe the '610 patent by, among other things, making and using interactive gaming products and services, including but not limited to, the EA Products, which include infringing interactive gaming technologies.  Such products and/or services include, by way of example and without

limitation the EA Platform, which is covered by one or more claims of the '610 patent, including but not limited to claims 1 and 11.

100.    By making and using interactive gaming products and services, including but not limited to the EA Products, EA has injured Virtual Gaming and is liable to Virtual Gaming for directly infringing one or more claims of the '610 patent, including at claims 1 and 11, pursuant to 35 U.S.C. § 271(a).

101.    On information and belief, EA also indirectly infringes the '610 patent by actively inducing infringement under 35 U.S.C. § 271(b), at least as of the date of service of this Complaint.

102.    EA has had knowledge of the '610 patent since at least service of this Complaint or shortly thereafter, and on information and belief, EA knew of the '610 patent and knew of its infringement, including by way of this lawsuit.

103.    On information and belief, EA intended to induce patent infringement by third-party customers and users of the EA Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement. EA specifically intended and was aware that the normal and customary use of the accused products would infringe the '610 patent. EA performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '610 patent and with the knowledge, or willful blindness to the probability, that the induced acts would constitute infringement. For example, EA provides the EA Products that have the capability of operating in a manner that infringe one or more of the claims of the '610 patent, including at least claims 1 and 11, and EA further provides documentation and training materials that cause customers and end users of the EA Products to utilize the products in a manner that directly infringe one or more claims of the '610 patent. By providing instruction and training to customers and end-users on how to use the EA Products in a manner that directly infringes one or more claims of the '610 patent, including at least claims 1 and 11, EA specifically intended to induce infringement of the '610 patent. On information and belief, EA engaged in such inducement to promote the sales of

the EA Products, *e.g.,* through EA's user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '610 patent. Accordingly, EA has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '610 patent, knowing that such use constitutes infringement of the '610 patent.

104.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '610 patent.

105.    As a result of EA's infringement of the '610 patent, Virtual Gaming has suffered monetary damages, and seeks recovery in an amount adequate to compensate for EA's infringement, but in no event less than a reasonable royalty for the use made of the invention by EA together with interest and costs as fixed by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Virtual Gaming respectfully requests that this Court enter:

A.      A judgment in favor of Plaintiff Virtual Gaming that EA has infringed, either literally and/or under the doctrine of equivalents, the '862 patent and the '610 patent;

B.      An award of damages resulting from EA's acts of infringement in accordance with 35 U.S.C. § 284;

C.      A judgment and order requiring EA to provide accountings and to pay supplemental damages to Virtual Gaming, including, without limitation, prejudgment and post-judgment interest; and

D.      Any and all other relief to which Virtual Gaming may show itself to be entitled.

## **JURY TRIAL DEMANDED**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Virtual Gaming requests a trial by jury of any issues so triable by right.

Dated:  December 8, 2015

Respectfully submitted,

/s/  Elizabeth L. DeRieux
Elizabeth L. DeRieux (TX Bar No. 05770585)
D. Jeffrey Rambin (TX Bar No. 00791478)
CAPSHAW DERIEUX, LLP
114 E. Commerce Ave.
Gladewater, Texas 75647
Telephone: 903-845-5770
E-mail: ederieux@capshawlaw.com
E-mail: jrambin@capshawlaw.com

OF COUNSEL:

Matt Olavi (CA SB No. 265945)
Brian J. Dunne (CA SB No. 275689)
OLAVI DUNNE LLP
816 Congress Ave., Ste. 1620
Austin, Texas 78701
Telephone: 512-717-4485
Facsimile: 512-717-4495
E-mail: molavi@olavidunne.com
E-mail: bdunne@olavidunne.com

Dorian S. Berger (CA SB No. 264424)
Daniel P. Hipskind (CA SB No. 266763)
OLAVI DUNNE LLP
1880 Century Park East, Ste. 815
Los Angeles, CA 90067
Telephone: 213-516-7900
Facsimile: 213-516-7910
E-mail: dberger@olavidunne.com
E-mail: dhipskind@olavidunne.com

*Attorneys for Virtual Gaming*
*Technologies, LLC*